May it please the court. Possession, whether it's actual or constructive, requires the government to prove the defendant had the ability to control an item. Mr. Neal, you've waived uninterrupted time, so I'm going to take the prerogative of interrupting you early so you'll have plenty of time to answer any of the court's questions. So, as I had been reviewing this evidence, and I've read the whole record here, and I kept being curious about that mysterious phone call under the bridge, and then you filed a brief on December 15th, which I thought was very helpful in kind of putting all that into perspective. You wrote a pretty strong section in that brief that was really focused on your separate point about whether Ms. Castro should have been deported, and you have a legitimate issue there. It seems to me, though, that in arguing that point, you've perhaps obviously unintentionally undermined the two defendants' positions regarding the randomness of the pickup under the bridge in Presidio because you say that that's not what happened. I don't mean this to be too long-winded. I'm going to read for everyone's benefit but to remind you of what you said in your December 15th brief and then ask you to comment on that as it relates to the possession with intent. You say, the evidence, however, did not suggest that Hernandez's pickup of Convestment Cada Castro and Castro's daughter occurred by chance. According to Agent Catani, Castro said the following, Castro, of course, being the absent witness, they crossed from Mexico into Presidio. She said they really didn't know the other two defendants that they crossed with. They crossed in the evening. When they went to Presidio, it was during the evening. They spent the night there in a ditch under the bridge. She wasn't really sure. She stated that the phone rang, and I'm putting emphasis on that, what I call the mysterious phone call. The phone rang in the morning and they were trying to look for a ride. They flagged down an individual and that's when the driver went to pick them up. I'm skipping one paragraph. This is from your brief. What happened is clear. The smugglers with whom Castro, Campos, and Moncada had coordinated either gave them a phone or took their number to relay it to Hernandez. Hernandez was the 17-year-old driver, of course, as you know. He called that number in the morning. Believing him nearby, they waved at the car nearest them and he picked them up. This is the common alien smuggling strategy, and you accurately quote a 2013 Fifth Circuit case about how this is the common method for alien smuggling. Then you say, the jury could not have reasonably disbelieved the accounts of Moncada, Campos, and Castro because they were sponsored by the government and corroborated by the investigation. Why doesn't this explanation that you've given, which I think accurately reflects what's in the record, suggest that these two defendants were in on this deal from the very beginning, that there was prearranged communication with Hernandez, and this was all part of one joint operation that included alien smuggling and a pickup and distribution of marijuana? Well, Judge Smith, there wasn't any marijuana in the car when they were picked up. What I think that that evidence shows is that there was an arrangement to smuggle these four people, Castro, Campos, Moncada, and Castro's daughter, that that arrangement was executed. And then I think we can conclude that there wasn't a plan to pick up marijuana because the driver intentionally drops Campos, Moncada, Castro, and her daughter off before he goes to pick up marijuana. Well, let's look at that a minute, and let's use some common sense. Now, this has to do with inferences that the jury, of course, can draw because the jury heard about the phone call and they heard about the pickup. Okay. So let's say that these two guys have made some kind of arrangement to be smuggled across the border or picked up on the American side and driven to Odessa, which is what they say. Either they've paid a bunch of money for that, or in return for that transportation, they've agreed to assist in loading and or distributing the marijuana. Now, does it really make sense, assuming that they're in on this deal and that there's some kind of exchange of compensation for alien smuggling, that this driver, whom they've never seen, picks them up, takes them to this roadside park and says, oh, I'll be back in half an hour. Please get out of the car. Are they going to stand there, sit there and believe him? Will he ever come back? And they've paid all this money and they're part of the deal. It doesn't make sense. Now, the government argues, effectively, it seems to me, that the woman was too small to have loaded these huge bales and she had her daughter with her, that the 17-year-old driver couldn't have done it by himself. So, and again, the jury could infer that these two defendants went and assisted with loading these 50-pound bales of $200,000 worth of marijuana, and then they came back to the roadside park, they all loaded up, and they departed. So, Your Honor, there's a lot there, and I think there was a lot there that wasn't in evidence. For example, the idea that they either paid, the first thing that struck me when you were talking was the government never introduced a theory that Mr. Campos and Moncada were in on this from the beginning, and the idea that they paid or had to agree to help marijuana, that was never in evidence either. I think that there's, if you look at what the government's evidence actually showed, it requires a lot of speculation to conclude that Mr. Campos and Moncada were involved in this in any way, and further, I think that the evidence affirmatively contradicted that they were involved to any degree greater than Ms. Castro. Now, it seemed like you were getting later to the point that they rearranged the marijuana within the car in order to get in, and the evidence does show that they participated in that rearrangement, but... But the jury could have inferred that they helped load the marijuana, the jury would have had to disbelieve Castro's account, corroborated by Agent Gattani, that the driver dropped them off, went to pick up the marijuana, and came back and picked them up. Our argument is that because the evidence only showed that they rearranged the marijuana, their mere touch of the marijuana and their presence on top of it in the back of the car did not show that they possessed it. Well, but that's the kind of decisions that juries make every day. In other words, they can believe or disbelieve any witness. They could disbelieve Castro and believe the government's argument about the weight of the packages and that only these guys could have gotten it done in that period of time. We can't tell the jury what weight to give to any particular part of the evidence, so the jury could have disbelieved part of it and believed the rest. Respectfully, Your Honor, they never had the ability to disbelieve Castro. The government deported that witness and the government's own agents corroborated the account that they then relayed through their agents and corroborated Castro's testimony. Including the phone call, including Castro's report about the phone call. Including the report that they received a phone call while they were waiting under the bridge to be picked up, yes, Your Honor, when there was no marijuana in the car. But to pivot briefly from possession, even more clearly the evidence shows that they did not possess with an intent to distribute. Well, let's, can we stick on possession for a second? I'm sorry, over on this side, other side, over here. No, it's okay. We were there yesterday. Yeah, sorry. Good to see you again, Mr. O'Neill. So your client admitted in the panel decision that you're defending, right, your client admitted in three different ways possessing the marijuana. So I'm reading from the panel majority opinion, quote, he understood why he was being arrested and in Spanish he said, well, I guess that's how it goes. Yes, I was in possession of the marijuana. Then he says again to a different agent in Spanish slang, and I was in possession of the marijuana. And then to Bustamante, he says he understood he was in possession of the marijuana. So my question is, what is the case you have where our court or any other court in the United States has ever vacated a conviction for sufficiency of the evidence on the basis of possession where the defendant admitted he was in possession? We've seen lots of cases. I would love to talk to you about the Seventh Circuit. We can get to that in a minute. But can you give me a case where the defendant says, I was in possession. Jury, here's the evidence. And then the Court of Appeals says, nope, nonetheless insufficient. Your Honor, I can't give you a case with that. So isn't that the end of it? That's the thing that's so wild. Like, I don't understand how you can write because we'd have to extend the law to do a new thing. No, Your Honor, I disagree. First of all, I don't that plain error standard does not apply to Mr. Campos. He gets de novo review with the heavy thumb on the scale and the evidence because you have to show me that there was no evidence he possessed, right? None. Yes. I have to show you that the jury cannot have reasonably inferred that Campos possessed. And there's none of the cases that discuss confessions have this sort of use of the word, a legal word, possession and exclusive reliance on that. The cases, Your Honor, cites where he says, or the instances, Your Honor, cites where he says, I possess, he seems to have a conception of possession, which is just touching, which is our argument is a wrong understanding of the legal definition of possession. If he had said something like, I carried the marijuana or I relocated the marijuana or I was, you know, participating in the marijuana smuggling scheme, then I agree with you. So you agree with me as to the co-defendant, because we're going to hear in a few minutes about Boncato, who does say I was rearranging the marijuana. And so you would agree that that's some evidence of possession. No, Your Honor, I don't think rearranging marijuana is evidence of possession. I'm sorry, I thought you just said that. If he had said that I was, I loaded it, unloaded it, moved it around so I could sit somewhere, that would be evidence, but it's not. So loading it is, I think, significantly different than rearranging it within a car. Loading it connotes that you have the ability to actually control it. And that's our argument on possession, that if you don't have the ability to control it, then you don't possess it. My difficulty with this case over here, I don't see any objection to the jury instructions. So the mere presence instruction was given. So I look at it as just a factual case. But this case is very different than, say, Moreno, because it looks to me like the jury was presented with pure credibility calls. In other words, I don't read this trial transcript to be you saying, at trial the defense was saying, this is a very important confession to possession. But that isn't what he said. And that's why you put the defense expert on to say all they said was positioning it. So at trial, no one was saying possession doesn't equal constructive possession. The defense was, you can't believe these agents because they didn't put it in their report, they didn't write it down, and they misheard it. So that's my first example of, that's a pure credibility call. The second example that maybe you could address would be, if I'm not mistaken, the on. And then the agent said later on, they said, OK, we had to fit ourselves in the car, so we removed it and we put it back in. That sounds to me like a credibility call, a false exculpatory at the beginning, and then they're in trouble, and then they admit it. That's so different. That's two examples of big credibility calls. Your Honor, I disagree with the characterization of it being a credibility call. On the first, the, uh, the Boncato put on evidence about the difference between possession and position. But looking at the defense's closing argument, as well as their presentation throughout the trial, the parties all agreed this was a case about whether the defendant's rearranging of the marijuana and position on top of it showed an adequate level of control to show possession and an adequate level of show, uh, of control to show an intent to distribute. Because as much as possession requires control, possession with an intent to distribute must require the ability to control where the marijuana goes. But then on the second credibility finding you're finding, it was, if you watch Government's Exhibit 3, which is in the record, it's a very brief exchange. You know, the, the, the officers walk up initially and say, you know, do you know what you're on? And our clients are more confused than denying, um, and they, uh, they immediately say the marijuana, right? And our clients say yes, or one nods his head and one says yes. One shrugs and one says no. I'm sorry? One shrugs, do you know what you're on? One shrugs, the other one says no. Those are, they're, those are, they're like, when they're asked, do you know what you're on? That's the initial question. That's the initial reaction. When the, when the agents immediately specify you're on marijuana, they agree. So that's just, that's why we give cases to juries. Your Honor, I, I, I, I think that this was a case where throughout the trial the defendants agreed that they knew it was marijuana. Then the question was whether they controlled it when they wrote on top of it. So can I ask you a legal question about the definition of possession? Can we talk about the legal definition of possession? Cause you keep coming back to that. So I understand that you and your co-counsel would like us to adopt the seven circuits rule that originates in kitchen, gets extrapolated into lane. Am I understanding the legal position? Okay. So that we can talk about whether in this procedural posture we even have the ability to do that, but I want to understand exactly what the content of the legal rule is. So this is from lane, quoting kitchen, right? To obtain control over drugs, a defendant needs more than just mere physical contact. He must have the perceived right among the criminals with whom he is interacting to deal, use, transport, otherwise control what happens to the drugs. Is that your understanding of the rule? Yes, sir. So when, how does the government do that in a case where they pick up somebody on the corner, right? And he's, he, he, he's not acting, they don't see him selling, right? He's just standing on a corner. Maybe they have an agent testify that this is a high drug area and he's holding in his, in his pocket, you know, 10 dime bags worth of marijuana. Do they need to call like his boss to testify about what this guy was doing with it? Because why can't he just, why couldn't the guy just say, you know what? I wasn't actually selling anything. I was just standing there with these 10 bags. In fact, I was holding it for my buddy who went into the convenience store to get cigarettes. So how in the world do we have testimony about the perceived ability to control the drugs that one is literally holding? That will almost always be a reasonable inference from someone holding drugs that they had the ability to distribute. Why? He's just standing on the street corner and he's holding it for his buddy. The uncontroverted evidence, right? All the government has is they picked up a guy standing on the corner holding 10 dime bags of weed and that's it. They have nothing else, right? In his testimony to the case agent is I was holding it from a buddy. What's your buddy's name? I don't remember. That's it. That's all they've got. And the jury is at, is called, we do this every day. You know, I'm sure you've seen these cases where the jury is called to infer possession with intent to distribute based on just that, nothing more. And my question is why don't we have to require the government to bring in other witnesses to say, well, amongst the criminal community, this guy had some right of possession that sounds in property law. Your Honor, it's because holding it demonstrates much more control than writing on top of it, first of all. But second of all, what makes this case as well as Kitchen, um, Edwards and Kearns different is that the person who actually controlled the marijuana was present there. And the, and the testimony was very clear. How many cases do we have where the person who unconscious, there's two people in a car passenger cases where one person unquestionably was the one who loaded it, concealed it, owned it, had the right to sell it. But both defendants go to federal prison. Your Honor, in every one of those cases, there is circumstantial evidence indicating that the passenger was part of the drug smuggling scheme. No, that's not true at all. Give me an example. I'm sorry, counsel, did you finish your sentence? No, I'm happy to give an example. Um, so in Canada there was an extensive interaction between the driver and the passenger. It was well established. They had been traveling together for a long amount of time. Um, I, I can't remember all the cases. I know exactly the citation in the dissenting opinion you're referring to. In one of the other cases, you know, there was evidence that the person knew where the marijuana was imported. Um, and in each of those cases, if you look at it closely, there's some additional circumstantial evidence and Crane is really important on this point, right? Crane says they were amid the camper, amid, amid the marijuana in the camper, but their mere presence there isn't enough. Instead, we rely on the additional circumstantial evidence that they were involved in an active offloading, uh, offloading operation. Here, the additional circumstantial evidence contradicts that we had the ability to control the marijuana. And if you're looking at dispossession or the ability to control the disposition of the marijuana when you turn to possession with intent to distribute, because there was no additional circumstantial evidence and further because, oh, I'm sorry, I've gone over time. Um, and, and I'll just finish this sentence. And further because compost, uh, because Castro's account contradicted any additional, uh, involvement, we know that the evidence was insufficient for possession and possession with intent to distribute. If there are no further questions. Thank you. May it please the court. I'm here for Mr. Moncada. Mr. Do you, um, agree with, uh, what Mr. O'Neill said in his brief that these were not just three people who slept under a bridge and got up the next morning and on Christmas Eve and went out to the highway and flagged down someone who was kind enough to stop and give them a ride for, for free all the way to, uh, uh, Odessa? I, I do not agree with what Mr. O'Neill wrote in his reply brief. I think that unfortunately what he wrote is what forms the basis of a lot of our complaint about this case. It's speculation. The evidence in this case from Agent Catani was she looked at compost's phone when it was unlocked. She looked at the text messages. She looked at everything else. I guess she could, but it's unlocked and then it shut down and she thought nothing of significance. What do you do about the evidence, the unrefuted, uh, uh, evidence that the phone rang when they were under the bridge and then immediately after the phone rang, they went out to the highway and lo and behold, here's this car that comes by and stops and gives them a ride. Well, I'm not sure that the evidence is that it's immediately. I think it's that they then go out and they flag a car down. And I think all of this comes down to the same thing, Judge Smith. It's the government's burden. And, and what we have constructed, unfortunately, Mr. O'Neill, but also you are constructing is a, is a narrative and it makes some sense with facts, but it requires a tremendous amount of speculation. Well, juries can infer all that, can't they? I mean, in other words, most of these cases are largely circumstantial. You acknowledge that. You usually don't have the, uh, uh, the smoking gun with these criminal cases. So the jury puts together, uh, uh, inferences and we construe those and, uh, in the light most favorable to the, to the verdict. But we have to, we, we know that you can't simply pile inference upon inference. And this is what happens here is government doesn't put much out there. The government says, look, these guys are on the marijuana. That should be good enough for possession with intent to distribute. The government doesn't put on any evidence that that phone has anything to do with it. The government agrees and continues to agree through its briefing in this case that there wasn't evidence that they had any intent or . . . This theory that's being advanced about what the facts could show, was this argued at any time by the government in this case? This, this theory that, oh, maybe they were in it together from the beginning or he, they had agreed to unload the drugs or they're going to the market in Odessa. Was this argued by the government? I don't think so, Your Honor. There's one line in closing argument, and I'm sorry, I don't remember the . . . But that's an argument. Was that, was that part of the evidence? No, it was not evidence. Did Agent Bustamante testify that he understood the defendant's intent behind rearranging the bundles was simply to fit in the car? That's, that's my memory of the record. In fact, I believe also Agent Ramos said it looked as if these two gentlemen had been shoved into the car. So did the agents give any testimony that they were part of this drug transaction in any way? No, the government entirely relies on the fact that there's a lot of marijuana and that they're there. And I think that's an And if we have time, Judge Oldham, I'd like to come back to that. I don't think they show intent to distribute. And I think if we make there near a large amount of marijuana, essentially automatically intent to distribute, that we're not . . . Isn't there a problem with the fact that the jury charge said intent to distribute may be inferred from possession of an amount of controlled substance that is too large to be used by the possessor alone? And I don't think y'all objected to that. No, I don't. And so, I mean, I know you're challenging possession. I understand that. But let's for the moment assume arguendo possession. I don't think anybody thinks that many pounds of marijuana is just for yourself. No, I . . . So why wouldn't the jury follow that charge? Well, I think that there has to be something more than the weight in the end. Because if you have evidence, government evidence, of a different purpose for why they're in that car, that the purpose is to continue their ride. And the government really has not only no evidence, but no real argument that they were going to do anything else, that they were going to distribute. And Congress defined distribute. It defined deliver. And the government has no evidence that they had an intent to do what Congress was criminalizing. Right, but can the jury not follow what they're told by the judge? I think, obviously, the jury can follow what they're told. But the question in this case is, is the evidence sufficient to prove what Congress criminalized? And the jury's instruction can't change that. When you say this, the government's case was entirely that they were touching the drugs. I just . . . and I have read the entire trial. This case was all about the credibility of the government witnesses. It was all about whether or not the clients had confessed to possession or whether all three agents misheard it to be they just said they positioned next to it. Additionally, you've got whether a jury believes it or not, a false exculpatory. So it's not a case about just presence. It's a case about . . . the trial of the case was, do you believe these agents as to what they said the defendant said or not? And I just don't see how that's not a jury question. Well, I think there are a couple things there, Your Honor. One is that the question of possession is a legal question, and a couple of migrant travelers are not the right person to answer that. And so the question is, did the jury have evidence from which it could make the correct conclusion or . . . But the only defense witness was a translator who said they misheard it as position. And the defense trial team said, these are very important confessions, but you shouldn't believe them because they didn't record them and they misheard them. That was the defense. It wasn't that, oh, accept it. They denied the statements, the confessions. The defense also said in its argument that they were travelers and that essentially marijuana was possessing them in the car, that the way they were positioned, they were trapped in, was evidence that they were mere migrants who are people who travel in these conditions. We see that all the time in migrant cases. We don't see drug smugglers traveling like this. Did the defense raise another defense as well? Did they also raise that the statements were custodial and that therefore they should have been Mirandized and shouldn't have been included? And didn't the government say at the last argument that if the court found they were custodial statements that we had to retry? Is that . . . so is that an argument that's here or is that not an argument that's here? No, that argument is here, Your Honor. The entire case is here and it's been briefed and the question of whether they were in custody, which I believe they were given the circumstances, the way the car was held by the side of the road, the way they were kept in a tight position, the way they were immediately removed, patted down, locked away in the van, questioned on the way to the van. There was no question they were not going anywhere. A reasonable person wouldn't have thought, oh, now I'm going to get to walk away. Nobody would walk away out in the middle of nowhere on I-10. Well, actually, Your Honor, we would certainly not. But migrants like this, in fact, walk all over the place. That's one of the reasons they were so grateful for this ride. Mr. Lynch, in answer to Judge Elrod's earlier question, in fact, the government did argue this implausibility point. They argued it to the jury and they argued it in their in-bank brief. To the jury, the government said the following, sort of sarcastically, it says, so let's talk about this story. They want you to believe . . . you, the jury. They want you to believe that they walked into the country with a female and her daughter and saw someone that they had never heard, never met, and said, hey, can I have a ride? Sure, I've never met you. Oh, and you have a female and her daughter? That's not suspicious. Hop in. That's from the government's statement to the jury. And in the government's in-bank brief, the government said, there was a degree of implausibility to their explanation of the rendezvous with Hernandez, Hernandez, the young 17-year-old driver, which suggested their complicity may have been greater than they let on. A prospective jury could reasonably question the credibility of their common account. There was a phone call. They, quote, flagged down a ride from Presidio to Odessa. Compass possessed two phones and they were unsuspecting victims of Hernandez's manipulations, which put them in the difficult choice of helping transport the marijuana load or staying in the roadside park. When it became obvious that Hernandez had two missions, transporting non-citizens and marijuana, they could have abandoned Hernandez in the contraband and attempted to catch another ride on I-10, but that's not what they did. So the government, of course, presented this not only to the jury, but to us as the in-bank court. May I answer, Your Honor? Of course. I don't think that they're taking a consistent position, okay? They, in their brief . . . Government doesn't have to take . . . As you know, the government can produce multiple theories of guilt in any case, and they don't have to elect their remedy, so to speak. That's true. And then I would say this quickly, Your Honor, if that is how you view the case, then I think we go back to something that you said to Mr. O'Neill at the very beginning. The Valenzuela-Bernal issue then becomes very important. The panel didn't decide that issue either. This court may wish to decide it on the briefing or it may wish to send it back to the panel. But if that's the way you view the evidence, then Castro's account of what happened, her ability to testify about how the men reacted, about what happened under that bridge, if that becomes important, then the fact that they deported her when they knew that she made a statement that supported them shows that the government did not act properly, and for that reason. So perhaps that issue should be reheard either by the panel or if this court wishes to decide it. Thank you, Your Honors. Good morning. May it please the Court. Richard Durbin for the United States. Putting aside for a moment the legal question about possession and definition, I think the question before the Court is, could a rational jury on the evidence before it have found the defendants guilty and found all of the elements of the offense of possession with the defendant? I think that's a very important question. I think that's exactly how the jury got there, but the discussion this morning has pointed out there's a number of different ways perhaps that this evidence could have been looked at. One is the defendant's view of it was, we were just getting a ride to Odessa, we were here unlawfully, and lo and behold, we end up dropped off at a park somewhere, and thirty minutes later they come back with one possibility. But the other possibility, as you pointed out, Judge Smith, is the jury who are a bunch of people who live out in West Texas, and we're talking about a big area in the Payton Division. There was a ride from Presidio to Van Horn, which that jury knows is at least two hours and probably two and a half hours. So they're in the car together, that's a long ride, and the jury can figure out there's got to be some kind of coordination here between picking them up on the border and going and finding 283 pounds of marijuana . . . Mr. Durbin, is that consistent with what you argued to the panel? I was very surprised to see that in the en banc brief because I thought that you told the panel that the government fully accepted the position that they were just along for the ride, and the reason that the government fully accepted that was because of the argument about the witness that was deported. And so the government was fully on board with the handling of the drugs at the time that they were moving them. That was the basis of the possession. This is a different theory that was made in passing in the closing argument, but I thought it was an inappropriate closing argument in light of the evidence, which doesn't necessarily require an objection. So are you saying now that the government's theory . . . one of the theories of the government is that really they were in on it the whole time? No. Because that makes a different analysis for the witness. What I'm saying, Judge, is that the evidence went to the jury, and the jury had the responsibility and had the ability to decide whether or not that story made sense. This is what has concerned me. The government put in the evidence of the innocence of their . . . they didn't testify. The only evidence that came in at trial as to why they were in that car, what happened, was from the government's interview of the woman that they deported, and their interviews with the two defendants before they were merandized. So the government is the one that put in that evidence, and it did not question that evidence. It put it in affirmatively in front of the jury. So there's no credibility question about, was the witness the actual woman they interviewed? The jury had no credibility to decide. I don't know that it's credibility, Judge, as much as I would characterize it as the jury looked at it as a plausibility. Is this an explanation of . . . But the government put that in. We did put it in. We put all of the evidence in. We didn't parse the evidence. We put it all before them. We put their full statements as heard by Catani and as heard by Agent Bustamante and as heard by Agent Ramos. That was all before them. But as I get to an en banc argument, and I'm looking at, wait a minute, what is the question here that I think should be before the court, in addition to the question of did they possess it? I mean, you've got to get to that at some . . . Well, shouldn't the jury have been entitled to hear from the other person in the car, the woman who had the child? What was she going to say? Everything . . . Well, her credibility could have . . . We don't know what she was going to say, first of all, because . . . Well, we have a pretty good idea because Catani testified . . . But you're just saying that the jury can draw inferences from what's hearsay evidence that the government put on the stand without . . . the defendants don't get to call her as a person and let her tell her story. Well, insofar as getting from Presidio, across the border, Presidio, to being stopped by DPS, there is no discrepancy that I see between what . . . She might have known about the phone call. Might have. Did the government tie up the phone numbers between the two phones that were on campus and the driver? Did the government . . . the government didn't take a statement from the driver? There are a lot of pieces that are missing that the government . . . And that was the defense. And all I'm saying to the court is that if the jury heard all of that and said, you know, okay, it wasn't a very good investigation. It was a new agent. It was Christmas Eve. I don't know that the A-team was out at that time of night on that particular day. A-team or not, they deported a material witness. And they had a video of what she would have testified to, and they have not offered it. And they let the perpetrator go? The district court found no error. That issue was before the district court. That's correct. So even if we review it de novo, we ought to put some credence on what the district court . . . I mean, we don't know what she would have said. Did they let the perpetrator go? No, they referred him to prosecution for the state. He was a seventeen-year-old. You're talking about the driver. Right, but he went in the wind, right? No, he was . . . I thought that they didn't pursue him, and so we don't have him either. Well, I don't know if he was in the wind. That to me means that he fled. I don't know that he fled. But we don't have anything from him, the person who actually did the drug deal. He appeared at trial and invoked his Fifth Amendment privilege before the court. I thought the evidence on the woman was that she indicated she was not willing to come and testify, and she was afraid to testify, and that that was the evidence before the district court. That was the representation by Mr. Campos's lawyer. Was that before or after she was deported, though? That was after. They . . . Ms. Milliron . . . But we don't know if she would have testified had she still been here. I guess the record evidence shows that once she was deported, she didn't want to come back to testify. She would not come back to testify. She provided some kind of a video. We don't know what that was. We don't know what her testimony would have been that would have been different from what she told Agents Catani and Bustamante on the night of the arrest. And she told . . . and Milliron represented that she said she would not come back because she feared she would be arrested. Well, she was deported and placed beyond the subpoena power of the defendants. Yes, she was beyond the subpoena power of the defendants. There's nothing in the record that they asked for any assistance in making arrangements for her to come back. They took her representation that she would not come back because she feared arrest. And this was done before any deposition could have been done to preserve, and I think that was complained about at the time. I believe she was removed very promptly. And so they didn't have notice, and they complained about that, too, because they said at least we could have gotten a depo. That's what they complained. This was all before the district court, too, was it not? It was all presented to the district court, and the district court denied their motion to dismiss based on violation of . . . So can you help us? I'm trying to figure out if this theory that was mentioned in kind of a drive-by in the closing argument, that really they were in cahoots the whole time, was properly before the jury. I don't . . . Can we reconsider that theory? Because I'm wondering if any of the government's agents presented that as a possibility, or did the government agents take the position . . . This is similar to what the Chief Judge Richman was asking, that the government agents themselves said, no, they have no relationship, they were just picked up along for the ride, and it just . . . the only time they touched these things are whenever they were moving to get into the car, because they couldn't fit otherwise. Can the jury speculate about that actually they were in cahoots the whole time, and they were going to unload the drugs, and they were actually going to the place, some kind of market in Odessa, to unload the drugs, and all of this? Can the jury make all of those assumptions without any agent testifying that at all? You know . . . Judge, I don't think they have to, and where I was . . . I'm not saying it . . . I'm not articulating it very clearly, but what my thought is, is the question is, could a rational jury on this evidence find them guilty? And a rational jury could look at it and say, we don't know whether they were in cahoots or not. We don't know whether they were just perhaps there because this was a diversion by the driver. Set all of that aside. We're not going to consider that in any way, shape, or form. What we have is evidence that they were at the rest stop, the marijuana was there, they reloaded the marijuana for the purpose of being able to continue on their way to Odessa. Okay. So should the court, in its decision making, if the jury is not supposed to be considering whether they're in cahoots or not, should the court consider whether or not they were secretly in cahoots or not? No. All I'm saying is the jury could have done that, and on the evidence that remains, a rational jury could find the elements beyond a reasonable doubt, and those elements are They possessed the marijuana. They were caught with the marijuana all over it on the way to wherever they were going, Odessa. And as they were instructed from that, they could infer that that quantity of marijuana was for the purpose of distribution or with the intent of tribute. Can you go over the possession, please? This is a very important thing. Is there evidence of dominion and control except for moving to fit yourself in? Or is that the evidence of dominion and control? We see this . . . you and I see this differently, Judge. And I see that under the circumstances, the jury could find that there was sufficient control in their decision to move that marijuana out and back in. And the tip from the highway was, somebody driving down I-10 said, they're loading bales into the car. That means somebody saw loading bales go into the car, and they said . . . they rearranged them, they moved them, they reloaded the car is what the inference was. And under those circumstances, the additional circumstances that are suspicious, they did that because if you accept the evidence, so they could have their ride to Odessa. In other words, their interest in the dope was the ride. It wasn't the sale of the dope. Mr. Durbin, didn't he . . . Excuse me, Judge. I want to hear his answer. You said . . . Can I ask a question after he answers? Absolutely. I would just like to not interrupt you. I wanted to hear what he said. You said they're . . . you were saying they're . . . I didn't mean to . . . Their interest in the marijuana was not the remuneration or the sale or the proceeds of it. Their interest . . . this is a strange case, but their interest was in something else illicit. And that other illicit thing was the service of driving them, in furtherance of being here unlawfully, to their destination in Odessa. And that's what their stake was. So they did have a stake in it. They had an interest in it. They were part of it. And by that conduct and with that interest, they shared the intent to distribute it. So I referred earlier, didn't the government also make the argument that these bales were so heavy that the woman probably couldn't have lifted them and that the 17-year-old driver could not have done it, at least in the limited amount of time that was permitted, so that there was the inference that maybe these two defendants were needed to assist in the loading of the marijuana, either at the roadside park or perhaps they left with the driver to pick up the marijuana somewhere else and bring it back. Isn't that part of what the government argued? I don't know that we argued that last point, Judge. There was in the record . . . But the point about the weight of the bags . . . The point about the weight was there's a comment that the woman could not have put that 55-pound bale on her knees by herself. Somebody had to do that. And I think there was some talk about . . . The 17-year-old wasn't big enough to do it. Is there any evidence in the record that they left with the guy to go pick up the dope? No. Okay. And in fact, the woman would be able to testify whether they left to go pick up the dope. I guess. I don't know. Am I oversimplifying the government's position? Tell me if I am. So, put aside whether this case was substantially about credibility, an initial denial, then an acceptance. Put aside whether it was about credibility to believe that they confessed to possessing. Am I oversimplifying it if the government's position is, when a person brandishes a gun, the jury can infer they possess it. When a person loads drugs, the jury can infer they possessed it. Absent a duress argument. I'm assuming they didn't ask for duress and say, well, we loaded it under duress because they would have shot us if we didn't. That's not an issue in this case. There was no duress. No. So, is the position as simple as that? If a person loads a contraband, loads drugs, or if a person brandishes a gun, the jury can infer that they are possessing it. That seems like common sense to me, Judge. And it's consistent with the notion of the offloader type cases. I mean, they're moving drugs from one container to another container. That's not the control to go dispose of it. That's not the control to go sell it. That's not even the control to go use it. But I don't think we would argue a whole lot about whether or not they were in possession of it. They're exercising dominion and control. They're exercising control over the thing. Now, they might be scared, very understandably. Right. And you'd ask for a duress instruction. You'd ask the jury to believe we had no alternative. And it might not arise to a defense, but it might mitigate. It might mitigate punishment. And that may be the circumstance here if the jury accepts what their story was, is that we didn't know and all of a sudden we're there and there's the marijuana. But as I say, they're put to a choice. They can go flag down another car. They can throw it out of the car and say, we made a deal for a ride, and it was a ride without marijuana. We're not going with the marijuana. You come back and get it after you drop us off. Or they can do what they did, which was to make the moral choice that they would move that stuff around, exercise control over it so that they could get what their objective was, which was the unlawful transportation. Can I ask a question? Do the drug cartels normally put a 17-year – I know they use minors, but would they put them in charge of a car with $200,000 worth of contraband? Yes. To go hundreds of miles? Yes. Okay. Mr. Durbin, let me ask you – But wouldn't that person have some kind of – I mean, he could be overcome by two other adults, couldn't he? Yeah, there's all kinds of risk in that. But what – I mean, this is way outside the record, but what we have found consistently on the border is problems with recruiting high school students to do this kind of stuff, to move drugs. I mean, we did not prosecute this person. Yeah, but he'd have to be pretty dumb to pick up two adult males who just needed a ride and are sitting on top of an obviously large and valuable stash of marijuana, right? Because they could have overtaken him. I'm not advocating the court make a finding, but my suspicion is these guys were muscle. They were to help put it in and take it out, but that's not in the record. But the jury could have found that. The jury could have disbelieved all their stories. My position is if the jury disbelieves that story, which they could do, then with what you have left, could they rationally find guilt beyond a reasonable doubt? And I believe that they could. I think that that evidence – if we didn't have this sort of strange twist in it, I think this would look like almost all the other cases where somebody has stopped a vehicle with dope in the road, and the question is whether or not they've knowingly possessed it, and if they did, it's a quantity that has intent to distribute. Mr. Durbin, let me get you back to Judge Higginson's question a little while ago. What less than what he posited is the government's position would constitute possession? There is some argument in this case that merely moving the bales around sufficiently so they could squeeze into the car would be possession. Is that the government's position? Again, putting aside all the other evidence, I'm not talking about whether a reasonable juror could accept it or whatever else. I'm just saying is that possession for purposes of possession with intent to distribute, moving the drugs within the car to make room to sit down? Are we at Judge Elrod's bus hypothetical? I'm not talking about, well, maybe it's a hypothetical, maybe it's not. I'm not trying to tie it to what Judge Elrod asked. I mean, there has been some argument in the opinions already that moving them sufficiently to make room to sit down, to lying on top of them to squeeze into the car would be sufficient possession, and this other evidence is just gravy. And I'm asking you, is that the government's position? And if that's the same thing Judge Elrod asked earlier, then you can repeat whatever your answer was. It's a circumstance that these facts don't present, and I don't know what the other circumstances are. I don't know where we are in the context. Well, you seem to be saying you need to add something to what I have posited, that it would not be enough. Let's say, well, I don't want to change it too much, but there's not quite so much marijuana in the vehicle, but there is a bag sitting on the seat where the person is going to sit, so the person moves the bag over. So if I chugged the speed bottle on the thing that you're talking about, have I possessed it? I was actually asking you. I don't think so. But if I pick it up and take it and throw it away while I have it, am I possessing it? I think common sense, everybody would say, yeah, he possesses it. If my 3-year-old grandson takes the carving knife from the table and runs through the house, he's possessing the carving knife. He doesn't have the authority to. Well, is he possessing it with the intent to distribute the knife and whatever else? So I'm talking about this crime. That's a separate. So let's not go too far for what you need to prove. No, no, I'm just saying those circumstances, I think common sense would say, yeah, I mean, if you're moving it to sit down on the seat and you don't need to and it doesn't make any difference and you have no stake in it and that's all you've done, it's a touching, I think, with the exception of the firearms cases, which kind of go both ways. That's a mere touching that may not arise to possession. But I think if you pick it up and move it around and you have to do that to take your ride and you have to do that so the ride can continue to take you, I think that is possession. That is an exercise, an intentional exercise of control over the object that's sufficient to constitute control as defined in these cases and in the jury instructions. So can you go through the bus? This is a similar thing where there's cocaine behind the bus driver's seat and you've got to move that so you can sit down. Yes. Do you possess the cocaine? Your hypothetical is great, Judge. It's right on the cusp. Can you help them? What's the answer? Well, what I . . . Or help us because not everybody listened to oral arguments. Right. My answer to that is in this circumstance, what these defendants did is they had to move that both to accommodate themselves and to accommodate the driver. And there's a deal going on here. In your hypothetical, as I recall it, it was essentially you move it aside because his box of dope that he's just told you that he has is in your favorite seat on the bus. And your preferred seat is that seat. It's the only seat on the bus. Yeah. Well, you just changed it. So you have to sit. It's a bus that says no standing, and it's the only seat, and it's behind the bus driver. Because the bus driver's dope. Then you've possessed it because you could get off the bus. Do I have to know that it's dope? Well, in her hypothetical, she does. She does know. She does. So if I'm walking out of the hotel, there's a guy with two bags. They look really heavy. I offer to help. Yes. I take one to his Uber. You don't know. No, I'm not in possession. You're okay. Although I handled it. We're not going to bother you. All right. Although, just to be clear, I think what you're saying is they possess. There's just no intent. In? In your interchange with Judge Graves. I just want to make sure. Well, he probably possesses it, but it's not a criminal possession because he doesn't know. There's no intent. No intent, and he doesn't know what it is. You have to know that it's a— So if you know it's drugs, then you possess with intent, even if you don't actually exercise control over the object. In fact, if you were to get off the bus with the drugs, you would be in big trouble. Well, you might be in trouble, but you still have control. Okay. I think. I mean, if you have the physical ability to carry it off with you, you may not have the authority to do it, but you still have control. So this situation is different from these hypotheticals in the following sense, that these guys have been—let's take their story as completely accurate. So these guys and the woman and her daughter are dropped off at the roadside park. There's no marijuana or other contraband present, and then the driver leaves and comes back 20 or 30 minutes later, and the car is absolutely packed full of what is obviously marijuana. There's no way that there's any real question about that. Instead of saying, uh-oh, we don't want anything to do with this deal. We're going to flag a ride with someone else, they climb in the car knowing that it's a marijuana enterprise of some sort. They don't know where it's going or maybe or how much money is involved, but they're anything but innocent at the time that they climb back into the car, move the marijuana around. They know that they're at least part of some kind of a deal that should smell pretty bad, smell not only the marijuana smells but the deal smells. That's our position, Judge, that that is a moral choice that they make at that time, and they become then part of that crime. Mr. Durbin, can we switch gears for a minute? We're here as the en banc court, and we've discussed possession, and that's an important thing, but we also have this possession with intent to distribute. It is true, as Judge Haynes commented and others have mentioned, that they gave the instruction that I think was given maybe for one of the first times in the Prieto Teos back in 1986 that says, intent to distribute a controlled substance may generally be inferred solely from possession of a large amount of substance. That instruction was given with no objection. That was absolutely given, and that is in our PJC, isn't it? It is. The PJC, the Modern Federal Jury Instructions, it contains another instruction that's being considered to be adopted right now, and I'm interested in knowing whether the government thinks that this is an accurate instruction and would be helpful in the context of cases such as this one. The possession of a large quantity of narcotics does not necessarily mean that the defendant intended to distribute them. Again, this is the Modern Pattern Jury Instruction, Criminal 5611, dated 2023. Does the government have a position on whether that would also be a helpful instruction to be given? Certainly. The possession of a large quantity of narcotics does not necessarily mean that the defendant intended to distribute them. So on the one hand, you may generally be inferred solely from the possession, but then the caution on the other side, the possession of a large quantity of narcotics does not necessarily mean that the defendant intended to distribute them. That's what the Modern PJC, you know, that's being proposed is. And we're sitting here as an en banc court, and we often comment on jury instruction. We don't often, but we do from time to time. Do you have a comment on that? And I'm going to ask the other side that as well. Do you want, is that related to this case, or do you just want my consultation? Well, it's related to this case in that, you know, for some it's a quandary that the instruction said, yes, you can infer. It actually says you may generally infer. Yes. But it doesn't give a caveat, well, but not in every case does it make sense to do so. Well, I tread very cautiously here because I haven't thought about that. I'm not familiar with it. But I have thought about what does it mean that instruction the jury can infer? May generally infer. May generally infer, or can infer, or is permissive, or whatever it is. And that's, and so that seems to me to be implicit that they don't have to infer that. It also would seem to be that if the jury is satisfied that the evidence shows otherwise, that they didn't intend to distribute, then the inference would not be one that they inferred for. I don't have the word generally in my notes. Maybe I got it wrong, but the jury charge on page 145 said intent to distribute may be inferred from possession of an amount of controlled substance that is too large to be used by the possessor alone. I don't have the word generally, but maybe it generally was there. I got missed. I don't think it was. I don't know that it . . . I mean, as I said, I'm thinking off the top of my head. I don't . . . may to me is permissive. It doesn't . . . Yeah, I know. I understand the word may. I just was not clear on it. Right. Sorry. As long as we're talking about hypotheticals. I'm wondering about the issue about whether the defendants were Mirandized, should have been Mirandized at the site of the stop when they apparently told the same story after receiving Miranda warnings back at headquarters. Why do we have that issue? Doesn't that make it harmless error or not? Judge, we have, whether wisely or not, have not urged a harmless argument in that. The statements were a little bit different. Excuse me. The statements at the car were an acknowledgement that they knew it was marijuana. Right. And Mr. Campos said that he helped. And then the interview subsequently that was Mirandized, done primarily by Agent Catani, that was not about knowledge that it was marijuana. That was about, what did you do? We moved it so that we could fit better. And so to the extent that the evidence at the car has relevance, I think it has primary relevance to knowledge that it's marijuana. If that goes, I think there's still evidence from which a jury could find. I just don't know that I can . . . And the defendants could have put in the Mirandized statements, right? And the Mirandized statements were in. Yeah, that's what I . . . Those were admitted. And so there's clearly sufficient evidence. Yeah. Now whether or not I . . . I don't want to . . . I understand your . . . I don't want to push you too far. Right. Fine. Okay. I just wanted to know. Yes. Are there any other questions? My time is up. Thank you. This was not a trial where the jury was asked to make a credibility determination. Everyone agreed that Mr. Campos and Moncada knew that it was marijuana, had helped to rearrange it, and then got in on top of it. But that did not show that they had adequate control over it. They were cargo just like the marijuana was. This was not a case where they were holding the marijuana on a street corner or where they were brandishing a gun. Here they rearranged it within the car. In most cases where someone is found holding drugs, there will be some circumstantial evidence indicating that they have control over the drugs. But that is not this case. And Judge Elrod, to answer your argument on the hypothetical, if we define possession strictly as control, I don't think we get to the intent to distribute argument. If we realize that they have to control it the same way the Seventh Circuit, the Ninth Circuit, and the Eleventh Circuits have said. But if we were to relax our requirements of control and say touching it is enough or rearranging it within a car is enough, then I think the question about whether the jury could have inferred control sufficient to show an intent to distribute comes into play here. And I think whether the jury could have inferred that also comes into play because of the statements of Castro and the government's corroboration of those statements through their investigation as well as their interviews of Campos and Moncada. At that point, when the government is presenting the evidence that shows that Campos and Moncada's only intent was to obtain transportation, did they act morally incorrectly by not alerting officers to the presence of marijuana? Did they possibly commit a misprison? Potentially. But when we get to the specific evidence of whether there was sufficient evidence to show that they possessed with intent to distribute, Castro's account as well as the government's investigation affirmatively contradicts that they had an intent to distribute. The government tells you their intention was to obtain transportation. So the jury cannot reasonably then infer contrary to the position taken by both parties. Campos and Moncada did not take the position that this was a credibility issue. They argued to the jury, showing the jury the picture that Judge Oldham attaches to the dissenting panel opinion, does it look like he has the power and intention to exercise dominion and control over the thing? I would tell you that those marijuana bundles were possessing these defendants. They couldn't even get out without the law enforcement taking the bundles out and letting them out. There is no possession there. There is no intent there. That was the argument made to the jury. And when you see Mr. Campos try to get out of the car and they have to take out three bundles and another passenger, the idea that the jury could have inferred that he had to load the marijuana up and still was able to get in there was not tenable. We ask the court to reverse. Mr. O'Neill, I wanted to make sure you got out the argument without interrupting you, but I just have one final question about the remedy here. Yes, sir. Thank you. If we do what you're urging to sort of follow the 7th, 9th, and 11th circuits, my understanding of the posture of this case is that we would not be able to send it back for some additional proceeding in the district court under the new legal standard. Jeopardy is attached. It's a sufficiency problem, so your clients would be directed to be acquitted under the new standard. Is that correct? The standard, the understanding of control that I'm advocating, yes. That would be, procedurally, I believe you're accurate. Perfect. Thank you. Thank you. Thank you, counsel. Mr. O'Neill, Mr. Lynch, I understand that you, the court understands that you were court appointed. You've done an excellent job for your clients, and we very much appreciate your willingness to take on these cases. The court will take a brief recess.